Case No. 15-1071 et al. New England Power Generators Association, Inc. Petitioner v. Federal Energy Regulatory Commission Mr. Parrish for the petitioner, Mr. Colton for the respondent, and Mr. Marshall for the intervener Good morning, Your Honors. I'm Ashley Parrish for the petitioner's excellent in the New England Power Generators. I've asked to reserve five minutes of my time for rebuttal. This case involves certain aspects of the pricing requirements that apply when new generators come into the New England capacity market. We've objected that it violates the Federal Power Act and the requirements of reasoned decision-making for three reasons. One, these requirements unduly discriminate against existing generators. Generators are paid differently for the same services. Two, the rates are unjust and unreasonable because it suppresses prices in the market. And three, the Commission hasn't explained its 180-degree turn from earlier precedent in the PGM orders. What I thought I might do this morning, Your Honors, is proceed in three steps. First, say just a few words about how the markets and these requirements operate and hopefully answer any questions Your Honors might have. Second, walk through the reasons why this violates the Federal Power Act and the requirements of reasoned decision-making. And then lastly, really ask the Court to focus on the Commission's in the Exelon rehearing order at J.A. 258-259 in four paragraphs. When you look at that, we submit that that does not satisfy the requirements of minimum explanation that this Court has required. So Your Honors, if I may start with how the market works, and I hope this came through in the briefing, but the way the capacity markets work is that there's a descending clock auction, which means that the market operator says, we need this much capacity, and the price starts off high, so everybody's in, and then it keeps dropping until they get exactly the amount of capacity they want, with resources exiting the market. When you get to that level, that's called the clearing price. Now the two requirements at issue here that work in tandem affect that clearing price. So the first is known as the lock-in requirement. The lock-in requirement says that when you are a new resource, but not for any existing resources, once you get that existing clearing price, you can then lock in for seven years. The second one is what we call the zero bid requirement, which says that even though they are getting paid that clearing price, in our brief we use an example of $10, they have to bid as if they're offering the energy at just a zero dollar, which means essentially no matter what the price is, they will sell their capacity. Can I ask a question about the auction itself? And so when a supplier bids during the descending clock auction, they don't have to bid all of their capacity, right? So Your Honor, it's complicated, and I want to answer your question without sort of messing up some basic things, but there are a lot of requirements as to how they have to bid their capacity, and many do have to put all of their capacity in, and there's a process called, which you've probably seen in the orders, called the delist bids, where they're able to withdraw their capacity at certain prices and say, okay, we're no longer supplying it anymore. So the answer to your question is yes, but it's like many things in FERC world, more complicated than just that. So it's something I don't need to worry about to decide this case? No, Your Honor, no. All you need to know, I think, to decide this case is that effectively as the price goes down, you get taken, resources get taken out of the market, and so the level of the price for all of the resources that remain in the market is the price that they get paid. What's significant, and I was going to say about these two things, is that it causes price suppression and undue discrimination in two ways. The first, as we explained in the briefs, is in that entry auction, if you need to build a new generator, and let's say it's going to cost you $70, you are now getting an installment plan over the seven-year period, so you're able to reduce your bid less than what you otherwise would. And then the second thing is that what it does is it suppresses prices in all of the out years, because instead of having the bid at the $10 or a higher amount, it puts it in at zero, which means that basically it drives the prices down. In the JA, at JA-6- I'm not sure I completely understand the first one for the following reason, that I thought that your argument was not that you object to either the lock-in or the zero price. What you object to is the consequence of both of those, which is that as a consequence of both of those, your theory is that the price gets artificially suppressed in years two through seven, and in those years, existing suppliers are then less able to participate because they're priced out. And so what you're objecting to is the lack of mitigation measures that assist that cadre of entities, right? And am I not understanding the argument correctly? No. Well, Your Honor, I think almost everything you said there is correctly with just a few tweaks. So it is true it's a combination of the two. It is true that our objection is that as a result of bringing the new entrance in, it's distorting the market prices. Our point is as though that distortion occurs in a two-step process. It occurs first in the entry auction, which first drives the prices down, and then it occurs as a second step in the out years when you have the zero bid. So you're absolutely right as to what we're asking for. All I'm making the point is is that you can see how prices are pushed down in both circumstances, both step one and step two. And Your Honor, what I was going to say is, and maybe this brings it to life, is that on JA6, JA44, and then by our expert on 176 and 77, we talk about what this means in concrete terms, which is But didn't FERC say in reliance on the expert report from, I believe it was the Brattle Group, that for new entrants that they would have to, actually instead of bidding, that it would have the opposite effect of what you're arguing, essentially, that new entrants without these measures would be bidding less to, I guess, to lock in. Your Honor, FERC's brief says that, referencing to comments by ISO New England, but the orders itself in those pages I referred you to don't actually make that point. There is some question as to how much it would depress prices, because there is some sense that you want to recover as much as you can in the seven years. One of the odd things about this is the useful life of a generator is 30 to 50 years, and everything is getting compressed down to seven, because obviously the new entrants, after seven years, become the old entrants. So, Your Honor, there is mention of that in FERC's brief. That's not what FERC says in its orders. If I could, though, just mention that we're talking about a $15 payment, or $15.82 for the new generators per kilowatt month, as compared to $1.50 or $3.50. And on the chart on 44 says that if you were to put in place the mitigation measures that are done in the PGM market, everyone would be getting closer to $10. Just as a practical consequence, for two generators about the same, we're talking about hundreds of millions of dollars over a period of the seven years. Just briefly describe the mitigation measure you're talking about. So, Your Honor, I would say two things. In the PGM market, the way they do that is that they prohibit zero bidding. They put a bid floor that says, essentially, if you're getting paid $10 at the clearing price, you have to bid the $10. It's more complicated than that, but that's essentially how it works. One thing that's essential is this Court has said, and Your Honor, you know this from your advanced energy decision earlier this year, which is that we can propose new things like we did, which is do something similar to PGM, but it's not our burden to actually come up with a just and reasonable process. And one of the things we put forward in our expert testimony is there are many different ways that the Commission has available to it to address the price suppression and the undiscriminated bidding. Essentially, what you are objecting to there, in the departure from best practice, is the PGM practice of forbidding zero bidding. It's never computed at zero. That's true. PGM makes it very clear, and as we say, the only explanation that the Commission has, in its order, is to say that its thinking has evolved. But we don't think that, you know, in this Court's world, that's just too clear. I'm willing to ask your friend at the other table about the explanation. I'd be grateful if you would, Your Honor. You know, I have an example that I might use that might help the Court understand why we object to this so much. And all I would say is that Your Honors might think it would benefit the taxpayers here if you had an extra clerk and you want to hire a clerk. And so you say to your other clerks, we're going to bring in a fifth clerk. And by the way, it's really hard to bring these clerks in in the middle of the term, so we're going to give them an incentive. And I bet your clerks might say, okay, a signing bonus, we didn't get that, but that might be okay. And our point is, is that we're not objecting to the idea of a signing bonus. But then you say, no, no, no, that's not what I'm talking about. For your salary that you're getting, the market rate that you told you would be getting is $75,000 a year, but we're going to give the new clerk $100,000 just because he's a new entrant. And your clerks might be okay with that until you said to them, well, what we really want is that I don't want the taxpayers to pay for that, even though I think it would benefit them. Instead, I want you each to pay, so now you're going to be paid $50,000. Like all of that, that's far enough difference that you're probably wasting your time on that. Well, Your Honor, I'm hoping that you understand that the key point there is that there is a difference between what happens when you bring someone into the market. And then once you bring them in the market, what's so perverse about the setup is not only are they giving a benefit to the new entrants, but they're forcing the existing folks to pay for it. And maybe, Your Honor, I'm playing to the gallery, maybe it's not helpful, but the point is that I think that the clerks would understand there's a difference between them paying for the benefit of bringing in everybody else. And that's the key objection that we have here, and the Commission has never addressed that at all. The Commission said that it's not necessarily discriminatory to treat new entrants differently than the existing suppliers, and that, I mean, the whole purpose of it is to attract new entrants and to incent them because we need them to, A, meet our capacity needs, and B, to provide more efficient energy production services because that benefits everyone, including consumers, in the long run. So, Your Honor, they don't actually say that. What they do say, first of all, I should let you know, the market is only designed to look at two things, price and quantity. So they don't differentiate. The Commission has never explained that. We also put a lot of evidence in the record showing that what you just said is not true, that it will actually drive people out of the market. The Commission never responds to that. And then the Commission's only explanation is that this will actually affect short-term prices. Our fundamental point is if you're looking at long-term interests of consumers and you are required to balance. The Commission never addresses that. In fact, the Commission's own brief on page 40 acknowledges this, that it's supposed to be accurate long-term pricing. The whole point is price suppression in the short-term doesn't result in that. So I'm a little confused about the zero price point in the following sense, that it doesn't seem to me that there's anything especially talismanic about zero prices because all zero price is, is a mechanism by which to assure that the new entrants are going to have their capacity figured into the market. Right? So you could put that price at a thousand, you could put it at zero. It doesn't matter. The economic effect is that they're going to be included as suppliers. Yes. So, Your Honor, I would just ask you to read paragraph 112 of the PJM order where it says this, we continue to find that they have not explained why a bid flow is not necessary to protect against zero price bidding behavior and the resulting discriminatory pricing. That is, the new resource would receive its first year price for all of the years in which it receives the special treatment, while the existing resources receive a lower price reflecting the extra capacity that's come in the market. That's the whole point, that if you think of it dropping down, if they're at 10, then the market could reach an equilibrium at 9 because that might be the next equilibrium point. But if they're actually down at zero, then it'll keep pressing down until someone else gets out of the market, which will drive prices down. That's why, as a practical matter, the new resources are getting over 15 and the existing resources are getting 1.5 and 350. Your reference there went to paragraph 112 in the PJM order, right? Yes, Your Honor. Is that included in your J.A.? It is not, Your Honor, but it is available at 128 for 61-157. I guess I still don't understand that, though, because what happens in PJM, for example, is that there's no zero price, but it's also true that the new entrance, the new entrance that would matter, what ends up happening is that they're paid separately. Their capacity actually isn't doing any work. It's just that they're paid separately, the effect of which is that the clearing price ends up being higher. I get that. The clearing price ends up being higher, and so that more existing participants, in theory, get to participate because they can supply capacity at the clearing price. Am I not understanding that? Maybe you are, and I'm misunderstanding you, which I think that's generally right. What it is is it's the, again, the new entrance and the old entrance under Fert Pressen are providing the same services, so why are they getting different prices? It's okay to provide incentive to bring them in, but once you get them in, you have to ensure that the rest of the market isn't suppressed down. The zero brings it down for the reasons recognized in PJM. That's why you could think of two things. Either you take them out of the market altogether, you just don't count them, or you let them come in and you do a bid for that says you bid in at the price that you receive. My point is simply that if it's equivalent just to take them out of the market altogether, then there's nothing talismanic about the zero pricing. It's just one could just say, well, all we're doing with zero pricing is treating them as if they're not in the market altogether, and then the consequence of that would be that the clearing price would be higher because their quantity just wouldn't be factored into the equation. And your first would get their 75 as opposed to their 50, and the zero bid makes them pay for every last one. Because the clearing price is higher. Ultimately, all we're talking about is what the clearing price ends up being. Right. Which should usually be set by the market, which is presumptively just unreasonable, and instead what we've got is a downward pressure on it. I think we're on the same wavelength. I want to make sure I reserve some time for rebuttal. I'd love to answer your questions, but also if I could save a few seconds. We'll give you some time for rebuttal. Okay. Thank you all very much. Thank you, your honors. Ross Fulton for the commission. Your honors, I think it may be helpful to take a step back here and sort of look at the first principles. This is a rule that was approved as part of a stakeholder settlement over a decade ago, and the commission has repeatedly upheld that rule as just and reasonable. In 2014, the commission, as part of a, again, another stakeholder settlement that altered the demand slope in the region, approved extending the lock-in period from five to seven years. So the petitioners then come within months saying that this rule is not just and reasonable. The petitioners then have the burden to first show that there's something not just and reasonable about this rule, that something has changed before we even get to their proposed remedy. The other issue that's a bit confusing is the petitioners sort of jump back and forth about what the problem is. At times, they cite the entry clearing price serving as a quote-unquote installment payment. At other times, they simply refer to the subsequent auctions where the new generators act as price takers. Aren't they just saying that those two working together constitute a factor that renders this unjust and unreasonable? That could be the case. It's not a matter of jumping back and forth. It's a matter of a two-component argument. One without the other isn't doing the work, whether it's good or bad, that the two together. That could be correct, Your Honor. I think then we need to separate it out because the entry clearing price cannot serve as an installment as they proposed because of the minimum offer price rule that this court upheld in the New England Power Generator case. So the minimum offer price rule for a new entrant, they have to bid at an administratively determined bid floor. So you can't come to the market and say, well, I'm going to spread my cost over seven years and say you have to bid at that initial clearing price. And this then gets to why the proposal to essentially require those new generators to bid at a bid floor for the remaining years would be problematic in the commission's understanding because once a new generator clears the market, all of its costs are up front. It has to build a power plant. But once those costs are incurred and it recovers those in the first auction year, it then has very low going forward costs, essentially the maintenance of it. So is everything you're saying equally true of PJM? In terms of the mechanics for a new generator, just yes, yes. So that seems to be the question then because I think at least economically I understand what you're saying. And the question would be if that's true, then why isn't the same regime in place for PJM? I think there's two reasons. The first is that as a background, the commission defers to the regional party, the regional system operators, the regional stakeholders and the rules they want to establish. So even if you look at the 2009 PJM decision that we were just discussing, the parties there that came asking for a rule similar to New England system operator said, hey, look at this rule. Why are you allowing, why do we have such a different new generator rule in PJM than we have here? And the commission in note 65 of that, for note 65 of that opinion said, well, that again in New England was part of a stakeholder settlement process. So we're going to, just as the commission repeatedly says in the orders here, we're going to defer to the regional parties. So from the get go, Is that the best explanation? What's that? Is that the best explanation that's in the record? Just saying we're deferring to the regional parties? No, but it's part of the explanation, which is that the reason that the commission defers is because these, Are you still on deference when you say the reason they defer? Yes. There's no other explanation than deference? No, because each region has different makeup, different, the states are different with the state policies are different. The generator profile are different. So I saw that argument in your briefs, and I guess my question about it is this, that I absolutely accept the proposition that regions are deference. They just seem like they have to be to some extent. There's geological difference. There's all kinds of deference. But of course, the question then becomes, why is it a distinction that actually makes a difference? And what I didn't pick up on was, although in theory there could be differences, where is there an explanation to the effect that that difference actually matters for these purposes? Because I think, and I'll just continue for 10 seconds, which is that you've got that argument that there are differences. And then you've also got another argument, which is that our thinking has evolved. So let's put aside our thinking has evolved for a second. I'm not saying that that's not sufficient. It might well be. We can get to that. But on the point that the regions are deference, that seems like something that conceptually could be true. But whether that's actually driving a different result is what seems open to me. Because I didn't see that explanation anywhere. I think that it's the commission reiterated here that that is what's driving it. Now, granted, maybe it was not fleshed out as much. But that's because the commission's working with a background here of years of orders upholding these rules and these separate processes. And from the commission's perspective, these have been driven by, again, from sort of the ground up by the stakeholders. It's presented to the commission. The commission must determine for that region, based on those rules, whether the rule is just and reasonable. And I should, not to sort of, I don't want to change the subject, Your Honor, but for a second, I should tweak that the rule is not, and PJM is not actually how the petitioners described it or what they're actually requesting as their remedy. In actuality, what happens is, let's say, for instance, a new generator has 300 megawatts of capacity and 200 of that clears in the first auction. They are required to bid basically near their initial clearing price in the locking years. But if the price drops, PJM will then begin to drop that 200 megawatts of capacity and essentially treat it as a price taker, similar to here. So it's not as different as petitioners make it out to be. The commission explains this in footnote 13 of the Exelon rehearing order. It might not be as different, but it must actually be different because otherwise the proposal would have been accepted to price at zero. There's some differences. I mean, for the primary difference is, so back to my example, that 100, the difference, primary difference, that 100 megawatts that does not clear in the initial auction, for PJM, that's treated as outside the capacity market. And that is paid outside the market here, the entire capacity for New England. So there is more capacities accepted here. But so it's the, I guess my- If I'm understanding the point, then when I bracketed it as there's, these regions are different, therefore you can have differences and then our thinking has evolved. Correct. So on the first one, again, it sounds like your argument is that, look, regions are different. It may be true that we didn't explain, the commission didn't explain why the regional differences necessarily translate into different results here. But that's because we start with what the ISOs, am I using the right- Yeah. Yeah. What they propose. And we just assume that the regional differences are baked into their existing formula to begin with. And that might well be explained by regional differences, but we didn't, we, the commission didn't explain that at the back end. It's just that it's built in as a front end assumption because the ISOs are the ones that have the default in their favor to begin with. And that's correct, your honor. And then not just the system operators, but also again, all the stakeholders that come together to put these packages together, for lack of a better word, where these new entry rules are just as small part of. And the other difference I should point out with PJM as well is the default position was different. So the PJM, to your point, the system operator came with the rule that currently exists in PJM and parties similar to here came to the commission and said, no, that's not just unreasonable. We want a new rule that's more like in New England. And the commission said, you haven't proven why this previous PJM rule is no longer just unreasonable. Here's the opposite where the system operator had the rule, the commission found it just unreasonable. Partners come and say, no, we want to be more like PJM. And again, the commission's finding that they have not proven that the default rule, if you will, is not just unreasonable. Which section are we working under on this? I don't remember the whole citation, but essentially six or five. You understand what I'm saying? I do. So when the system operator comes, it's 205. And when the petitioner's here, when a party's challenging it, it's 206. So we're under 206 here? We are, your honor. And they have the burden? They do, your honor. Okay. Yes. And again, in that burden, again, coming to the commission when the commission had just in practice approved this big change to the system operator's rules where the commission had upheld the new engine rule, it's just one part of this package of reforms that the commission thought would ensure system reliability in New England because the region was facing severe capacity shortages and potential price shocks as a result of that. So that point is that because the burden is on the challengers under 206, discrepancy could be explained simply by virtue of the failure to carry the burden in both proceedings, even if the results seem somewhat in tension with one another. It's just that the burden wasn't overcome in either case. Correct. Then if we go to your second set of explanations, which is that our thinking has evolved, which in fact seemed like the driving one to me from the order that our thinking has evolved. Does that mean that someone can then go back to the PJM order and challenge that on the basis that, look, FERC's thinking has evolved. They now see the virtue of the zero pricing model. And therefore, we can relook at PJM to see whether this makes any sense any longer now that we know that the commission is thinking of things in a new way. Yes, your honor. Not to provide the road map, but yes, the commission in all seriousness would consider that a petitioner could easily come and bring a section 206 filing and say, the commission, hey, you said your thinking's evolved from this nearly decade-old PJM order. Why shouldn't this apply in PJM? Okay. Now, does the commission's decision further explain in what fashion its thinking has evolved? Yes, your honor. The commission's position is based on underlying economic theory and principles. And that in combination with its experience with the marketplace. You have to remember in 2008, 2009 with the PJM decision. Briefly put, what is the commission's explanation for the evolution of its thinking? The commission sees price-taking offers by new generators that have recently entered the market as competitive offers. So, it's competitive. Absent this rule, the commission sees that new generators would still bid as price-takers. And so, it's competitively efficient for new generators to bid as price-takers. And it's competitively efficient for the capacity auction to select that capacity. And it's not as if the evolution in thinking is born of some new fact that entered into the field of vision that wasn't taken cognizance of before. It's just, your view is it's fine for the commission just to say, yeah, we knew everything back then. We just, for lack of a better word, we just weren't thinking as clearly and we weren't right back then. Now, we understand the force of the proposition that zero pricing makes sense. And that's where we are now. That's correct, your honor. The commission here adequately explained why it's changing its policy. And it's based on those, as you said, not on different facts. But just on a better, the commission, a correct understanding of how the basic supply and demand function. So, the problem would be instituting the rule. The basic problem with the petitioner's position is just assuming that lower prices would equal price suppression. What the commission's finding here is, naturally, in a well-functioning supply and demand market, when there's new, more efficient generation entering the market, that could, in fact, result in lower prices because of an increase in supply. But the commission sees that as a natural competitive effect. You would recognize that the naked phrase, our thinking has evolved. But you, if that by itself would put you sort of on the edge of the arbitrary and capricious standard, if you just said, we did something different before, we're doing something different now, we're just thinking different about it. Does that sound at all like you're in danger of failing arbitrary and capricious? It would be if that's all the commission said. But the commission's entire orders, as long as the agency adequately explains why it's policy position. Condition. Yes. And the commissioner is, the entire order, the one constant through all of these orders is the commission saying that these price-taking bids by new generators reflect a competitive market condition. And the commission's goal here is to replicate a competitive supply and demand market as much as possible. And so to force these capacity, the new generators to bid at this artificial bid floor, which is, again, required by the minimum offer price rule. So in the first place, they're bidding at an artificially high price, would then result in consumers having to pay not only a higher capacity clearing price, but then having to buy this otherwise new generation that should have cleared the auction outside the auction. And so in reaching its balance, the commission... Which is what happens in PJM. Again, with caveats, yes, correct. And the commission, as to Judge Santel's point, its evolved thinking is that's not necessarily a good outcome because it does not reflect what a competitive market would do.  Thank you, Your Honors. Thank you. Good morning. Jason Marshall for Intervenors on the brief in support of the commission. Your Honors, just to follow up on the discussion that's taken place so far, we agree with the characterization that the commission's thinking has evolved. And just to put that in context, these markets are still relatively new. I think the forward capacity market in New England has only been in place for roughly seven years or so. So that sort of evolution and experience with the market is precisely what an expert agency like FERC should adapt to. There's been a lot of discussion on the PJM rule. And I want to underscore that the PJM rule itself is not a carbon copy of the rule and the alternative proposal that generators have put forth here. And I think counsel for FERC explained that there's a mechanism in that rule where if that resource is bidding in at its initial locked-in price, the lesser of its initial locked-in price, or 90% of net cone, and if it doesn't clear, PJM will then bid it in at a lower price so that it does clear. It's very different from what petitioners have put forth here. And FERC, I think, appropriately and adequately explained that that kind of proposal would lead to price distortion and in New England cause, I said in New England, the system operator to procure those resources out of market and causing more costs for consumers without any reliability benefit. Is there another difference, too, in the duration of the lock-in period? There is a difference there, Your Honor. Yes, in PJM, it's, I believe, three years, as opposed to New England. Now it's seven years. There's a number of differences between the rule, even the objective of the rule itself in PJM versus New England. I see I don't have much time left, but just the overarching point, I think, petitioners are arguing that FERC failed to consider the impact of this rule on existing suppliers and that it didn't sufficiently consider price suppression. But, Your Honors, FERC addressed both of those issues. It found and explained why the new entry pricing rule was consistent with a competitive market outcome. There is no price suppression to correct. And the effect on existing suppliers is competition, exactly what the market is intended to produce. And just one more point, Your Honors. I know there was an issue brought up regarding an installment plan. I think petitioners described it as allowing a resource to bid in less because they knew they had this locked-in price. And I just note that there is competing evidence in the record to rebut that point. There's another expert testimony that we had put forward in the underlying case that stated that, in fact, resources would have an incentive to offer higher because this was the price that would be locked in for this period of time. They want to maximize their revenue. And in any event, Your Honor, the minimum offer price rule, which is referenced in FERC's brief and in their order, this allows a resource from offering in at an artificially low price. So in that initial entry option, that resource cannot offer in at anything below what their going-forward costs are unless they justify it. Unless the Court has any questions, we'd refer you to our brief on any remaining issues. Thank you. Thank you. Mr. Barish, give me two minutes back, please. Thank you very much. Four quick points. First of all, Your Honor, my friend did not correctly describe PJM. In PJM, they didn't defer to the ISO there. What they did is they rejected a proposal not to have the bid floor as unjust and unreasonable. Again, if I refer you to paragraph 1.1.12. So they made an affirmative finding there that not having the bid floor would lead to unjust, unreasonable, and unduly discriminatory rates. He has no response to that. Your Honor, second— Was it a 206? Was it under 206? Well, ours is under 206. Theirs was a proposal that was provided, and the Commission said we're—probably under 205, but the Commission said we're rejecting it because it's not just and reasonable. That goes to the second point. He has a lot of wind-up, and also in his brief, about how this rule has been around for a long time. He keeps saying we need to show changed circumstances. The judge said, until you know from the advanced energy order, there's nothing in the Federal Power Act. 205 says that when the Commission accepts something, it's doing it in a passive role unless it rejects it like it did in PJM. So you're always allowed to bring a 206 complaint, and it doesn't matter because the Commission recognized there's nowhere in its orders does it say that this was somehow waived because it wasn't raised before. In fact, the explanation is what I've referred you to. You won't find it in the orders. Third, I'd ask you to look at paragraph 18 on JA259, which is where you get the explanation, where the thinking has evolved. Nowhere in there do they give an adequate explanation. They say now that this is in favor of competition. If you think for a minute that makes no sense, we put pages and pages of economic analysis and they responded to none of it. And then lastly, he talks about the artificial high price, which is related. Again, that doesn't respond to our objections, and it leaves us with the point that the whole point of putting a bid floor in is to suppress prices, is to lower the prices. He has no answer to why, in my analogy, your clerk should be paying $50,000 to ensure that you get to hire an additional clerk at $100,000. It's that under-discrimination and unjust reasonableness that has not been explained. We would ask you to remand for the commission to do its job properly. Thank you very much. Thank you, counsel. The case is submitted.
judges: Srinivasan, Wilkins, Sentelle